UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
FRANK BURGIO,

                    Plaintiff,                <u>MEMORANDUM & ORDER</u>
                                              06-CV-6793(JS)(AKT)
      - against -

THE PRUDENTIAL INSURANCE CO.
of AMERICA,

                    Defendant.
------------------------------------X
APPEARANCES:
For Plaintiff:      Jason A. Newfield, Esq.
                    Frankel & Newfield P.C.
                    585 Stewart Avenue, Suite 301
                    Garden City, NY 11530

For Defendant:      William Joseph Payne, Esq.
                    Stevens & Lee, P.C.
                    620 Freedom Business Center, Suite 200,
                    P.O. Box 62330
                    King of Prussia, PA 19406

SEYBERT, District Judge:

        Plaintiff  Frank  Burgio  ("Plaintiff")  claims  that

Defendant Prudential Insurance Company of America ("Prudential")

improperly   terminated   his   long-term   disability   benefits.

Plaintiff  sued  Prudential  under  the  Employee  Retirement  Income

Security  Act  ("ERISA"),  and  both  parties  have  cross-moved  for

summary  judgment.   For  the  following  reasons,  Plaintiff's  motion

is DENIED and Prudential's motion is GRANTED.

<u>BACKGROUND</u>

        Until   1993,   Plaintiff   was   a   Prudential   sales

representative,   or   "District   Agent,"   whose   duties   included

selling insurance policies and servicing Prudential policyholders. (Administrative Record, Prudential Ex. A (hereinafter "R.") at PRU1567-68, Job Description.) According to the District Agent job description, "[i]n order to carry out the essential functions of the job," the employee "[m]ust be capable of providing service to policyholders at their homes on demand. This will include traveling to and into homes for such purposes . . . ." (Id. at PRU1568.)

Plaintiff stopped working on May 3, 1993 due to "an unstable left knee." (R. at PRU0279-80, Disability Benefits Claim Form.) Plaintiff qualified for short-term disability payments, (R. at PRU285-86, Notice of Employee Disability, Duration of Benefits), and he was later approved for long-term disability ("LTD") under Prudential's Welfare Benefits Plan (the "Plan") in May 1994 (R. at PRU1384, Prudential May 18, 1994 Approval Ltr. to Plaintiff). Under the Plan, Prudential employees who exhaust their short-term disability payments and "are totally disabled from performing any and every duty pertaining to [their] occupation as a District Agent" are eligible for LTD. (R. at PRU1230, Plan Documents.) Plaintiff's LTD was based on an osteoarthritic condition in his left knee that caused him "difficulty walking, driving a car." (R. at

PRU0197, Disability Claim.) There is no question that Plaintiff has had numerous surgeries and attempts at physical therapy over the years. (See, e.g., R. at PRU1295, Prudential Feb. 5, 2002 Ltr. to Dr. Adler.)

To maintain his LTD benefits, Plaintiff was required periodically to submit medical evidence of his total disability, including by completing questionnaires describing his daily activities. In 2001, Plaintiff completed one such questionnaire and indicated that he attends sporting activities "with help or assistance" and that he rides in a car several times daily. (R. at PRU0044, June 25, 2001 Daily Activity Questionnaire.) In January 2003, Plaintiff indicated that he drives "usually daily" but that long car trips "are a problem." (R. at PRU0299, January 13, 2003 Daily Activity Questionnaire.)

Prudential also required Plaintiff to submit to occasional medical exams. In February 2002, Plaintiff was examined by Dr. Steven Adler. Dr. Adler concluded that:

> The claimant should be able to perform his basic activities of daily living. Limitations would include excessive walking, excessive stair walking, and avoiding assuming any one posture or position for long periods of time. The question was asked whether the claimant would be harmed if he returned to his own occupation. It is likely there would be no permanent changes in the claimant's musculoskeletal integrity

> but pain would be a significant factor in
> his probable inability to return to work.
> He would be best suited for more sedentary
> work.

(R. at PRU0853, Adler Report.)

Prudential also used private investigators to keep tabs on Plaintiff's medical condition. In December 2001, investigators researched Plaintiff and concluded that although his lifestyle at the time was "fairly" or "moderately" active, surveillance might be useful in the warmer months when he might be more active. They recommended tabling their investigation until then. (See R. at PRU1367-68, PRU1387, Plan Committee File.) In May and June of 2003, a different group of investigators videotaped Plaintiff walking without a cane, driving, and participating in little league practice. On this video, Plaintiff is seen carrying a large equipment bag, walking without assistance, and pitching to little leaguers. (See Prudential Exs. H and I.) For most of the two-hour practice, Plaintiff is walking and standing without assistance, but he occasionally appears to be resting his weight on a chain link fence during the half-innings when his team is at bat. Throughout the surveillance video, Plaintiff is occasionally observed with a slight limp.

In October 2003, after it had received the

surveillance video, Prudential hired Dr. Craig Rosenberg to conduct an independent medical review of Plaintiff's case. Dr. Rosenberg examined Plaintiff and reviewed his medical file, and in an October 14, 2003 report (the "Initial Rosenberg Report"), he concluded that Plaintiff was disabled. Specifically, Dr. Rosenberg explained:

> [Plaintiff's] limitations and restrictions include occasional walking, occasional standing, no crouching, occasional stair climbing, occasional driving (with an automatic transmission) and lifting is limited to no more than 20 lbs. on occasion. He has no limitations with sitting and he is capable of working an 8-hour workday.

(R. at PRU0358-59, Initial Rosenberg Report.) Dr. Rosenberg also noted that Plaintiff told him that the District Agent position requires "constant travel by foot and/or by car" and that Plaintiff "denies participating in any of his children's organized sporting activities" but states that he "is occasionally able to play catch with his son." (Id. at PRU350.)

When it received the Initial Rosenberg Report, Prudential wrote to Dr. Rosenberg thanking him for his evaluation but noting that "in your report, you do not indicate that you have reviewed the surveillance report or DVD we provided along with [Plaintiff's] medical records, which showed [Plaintiff] being physically active and contradicts his stated

activities." (R. at PRU1306, Prudential Nov. 10, 2003 Ltr. to Dr. Rosenberg.) The letter describes the surveillance videos and clarifies a District Agent's official duties: "Please be advised that [Plaintiff's] job is classified as light duty and requires occasional walking, occasional standing, occasional sitting, and he would not have to lift any more than 10 pounds, which is the approximate weight of the lap top computer he would need to use." (Id.) The letter concluded by asking Dr. Rosenberg to review the surveillance and provide an addendum report. (Id.)

Dr. Rosenberg submitted an addendum report (the "Addendum Rosenberg Report") stating that he had observed the video of Plaintiff pitching during little league practice. Dr. Rosenberg said that he had observed Plaintiff "lifting and carrying a large equipment bag and standing in an unrestricted fashion. He remained standing throughout the video. He was not wearing any supportive devices and he did not use an assistive device during the surveillance." (R. at PRU0676, Addendum Rosenberg Report.) Dr. Rosenberg explained that during his physical examination of Plaintiff,

> [Plaintiff] had told me that he was unable
> to participate in any of his children's
> organized sporting activities and that he
> only occasionally was able to play catch

with his son as a result of his
disabilities.  This is clearly contradicted
by the surveillance report and video.  In
addition, [Plaintiff] came to the
examination ambulating with a straight cane
and he advised me that he requires a
straight cane for ambulatory activities.
Again, this is contradicted by the
surveillance information.

(Id. at PRU0676-77.)  Dr. Rosenberg continued:

[Plaintiff] described his job as an agent as
requiring constant travel by either car or
by foot.  [Plaintiff's] job description
reveals that it is classified as light duty
requiring only occasional walking,
occasional standing, occasional sitting, and
he would not be required to lift any more
than 10 pounds.
     It is my opinion that [Plaintiff] is
capable of performing his job duties as an
agent for Prudential Financial.  To clarify
my report dated October 14, 2003, it was not
my stated opinion that [Plaintiff] was
totally disabled from performing his former
job as an agent.  I listed his restrictions
as occasional walking, occasional standing,
no crouching, occasional stair climbing,
occasional driving (with an automatic
transmission) and lifting limited of no more
than 20 pounds on occasion with no
limitations of sitting.  In addition, I
stated that he was capable of working an
eight-hour workday.  These restrictions
match your description of [Plaintiff's] job
classified as light duty requiring
occasional walking, occasional standing,
occasional sitting, and no lifting more than
10 pounds.

(Id. at PRU0677.)

     Prudential terminated Plaintiff's LTD benefits on

November 20, 2003, citing, among other things, Dr. Rosenberg's conclusions and the surveillance video. (R. at PRU1265-66, Prudential Nov. 20, 2003 Ltr. to Plaintiff.) Prudential explained that a review of Plaintiff's records "revealed that the frequency and intensity of your treatment did not support a totally disabling condition." (Id.)

Plaintiff appealed Prudential's decision four times, and Prudential's decision was upheld in each instance, including twice after additional medical reviews. For Plaintiff's first appeal, Prudential hired Dr. Mark Kaplan to review Plaintiff's administrative file, which included his medical records and the surveillance video. In an April 14, 2004 report, Dr. Kaplan observed that the surveillance video showed that Plaintiff "has minor gait abnormalities, but is able to participate in recreational activities." (R. at PRU0339, Kaplan Report.) He concluded that Plaintiff, as evidenced by the video, is able to stand and walk to a "significant degree" and that the activity limitations Dr. Rosenberg recommended for Plaintiff appeared to "somewhat underestimate [Plaintiff's] capability." (Id.) "As demonstrated by the surveillance video, [Plaintiff] appears to have a walking and standing capability somewhat in excess of that given by Dr. Rosenberg." (Id.) Prudential denied

Plaintiff's first appeal on May 5, 2004. (R. at PRU0980, Prudential May 5, 2004 Ltr. to Plaintiff.)

Plaintiff appealed again, and this time Prudential examined medical evidence that Plaintiff submitted and had another doctor, Dr. Patrick Foye, review Plaintiff's file. (See R. at PRU1270, Prudential May 27, 2005 Ltr. to Plaintiff.) Dr. Foye reviewed Plaintiff's records and concluded that Plaintiff "should indeed be capable of performing his regular occupation on a full-time basis." (R. at PRU0600, Foye Report.) Among the evidence that Plaintiff submitted for this review were reports from Drs. Gerard Varlotta and Thomas Erricho. (R. at PRU1270, Prudential May 27, 2005 Ltr. to Plaintiff.) Dr. Varlotta opined among other things, that Plaintiff could not tolerate an eight-hour workday as an insurance representative. (R. at PRU0963, Varlotta Report.) Dr. Errico opined that Plaintiff's condition was worsening. (R. at PRU0961, Errico Report.) Prudential denied Plaintiff's second appeal on May 27, 2005. (R. at PRU1270, Prudential May 27, 2005 Ltr. to Plaintiff.)

Plaintiff appealed a third time, but he did not include any additional information in support of his request and the appeal was denied on July 11, 2005. (R. at PRU0984, Prudential July 11, 2005 Ltr. to Plaintiff.) Shortly

thereafter, Plaintiff commenced his fourth and final appeal, this time to the Plan's Administrative Committee (the "Committee"). Plaintiff did not submit any additional material for this review, either, but the Committee was given extensive documentation concerning Plaintiff's case (see Committee File, PRU1367-499), including all of the evidence submitted on Plaintiff's behalf at earlier stages of the proceeding (see Prudential Jan. 4, 2006 Ltr. to Plaintiff, PRU1274). The Committee denied Plaintiff's final appeal on January 4, 2006, concluding that although Plaintiff "may continue to experience limitations due to [his] condition, [he does] not meet the definition of Total Disability . . . ." (Prudential Jan. 4, 2006 Ltr. to Plaintiff, PRU1274.)

<u>DISCUSSION</u>

As will be discussed, Plaintiff cannot overcome the deference to which Prudential's decision to terminate Plaintiff's LTD benefits is entitled.

I. <u>Standard of Review</u>

Where an ERISA benefits plan provides the plan administrator with discretion to determine eligibility, the Court reviews the administrator's decision for an abuse of discretion. <u>McCauley v. First Unum Life Ins. Co.</u>, 551 F.3d 126,

130 (2d Cir. 2008). Here, the Plan vested Prudential with discretion to determine Plaintiff's eligibility for LTD benefits (see R. at PRU1234, Plan Documents), and under an abuse of discretion standard, the Court may not disturb Prudential's decision unless it was made "without reason, unsupported by substantial evidence or erroneous as a matter of law," Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 83 (2d Cir. 2009). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003) (quoting Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995)). This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker. Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995); see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995) ("The court may not upset a reasonable interpretation by the administrator.").

Plaintiff suggests that the Court should apply a more exacting standard because Prudential was responsible both for

evaluating Plaintiff's eligibility and for paying those benefits. (Pl. Br. 5-6.) The Second Circuit, however, has rejected the idea that district courts must review plan administrators' decisions de novo any time the administrator labors under a conflict of interest.[1] McCauley, 551 F.3d at 132. Rather, where there is evidence that a conflict of interest influenced the administrator's decision to terminate benefits, that conflict is weighed as a factor in determining whether the administrator abused its discretion. See id. at 128. "No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." Kelly v. Handy & Harman, 406 F. Appx. 538, 539 (2d Cir. 2011) (quoting Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 140 (2d Cir. 2010)). The proper weight afforded Prudential's conflict of interest in this case is discussed in more depth, below.

II. Application to Plaintiff's Claim

Prudential did not abuse its discretion in terminating Plaintiff's LTD benefits because there was substantial evidence to support its view that Plaintiff was not totally disabled from performing the District Agent job.

---

[1] Plaintiff concedes this point in his reply. (Pl. Reply 4 n.8.)

## A.  Total Disability Defined

Prudential's LTD disability Plan defines eligibility for LTD benefits as being "totally disabled from performing any and every duty pertaining to your occupation as a District Agent." (R. at PRU1230, Plan Documents.)  A District Agent's duties entail servicing Prudential's policyholders' insurance needs, including traveling to policyholders' homes for meetings. (R. at PRU1567, Job Description.)  In the main, these duties are not inconsistent with Prudential's position that the District Agent job requires only "occasional walking, occasional standing, occasional sitting," and lifting no more than ten pounds. (R. at PRU1306, Prudential Nov. 10, 2003 Ltr. to Dr. Rosenberg.)[2]

_____

[2] Whether driving was an essential part of the job is disputed. Driving is not listed in the Job Description, and Prudential maintains that driving was not essential. (See Def. Br. 26-27.) Plaintiff argues that, practically speaking, District Agents who could not drive would not be able to meet their sales goals. (See Pl. Opp. 4.)  Ultimately, inasmuch as driving was not an "official" job duty as set forth in the Job Description, the Court thinks Prudential was entitled to rely on its interpretation of the essential duties of the position.  See Wenzel v. Prudential Ins. Co. of Am., No. 03-CV-5751, 2005 WL 2365221, at *7 (E.D.N.Y. Mar. 28, 2005).  More to the point, though, is that there is substantial evidence from which Prudential could have properly concluded that Plaintiff was physically able to perform whatever driving was required. (See Def. Exs. H and I (surveillance video); Initial Rosenberg Report, PRU358-59 (limiting Plaintiff to "occasional" driving with an automatic transmission).)

13

B. Plaintiff was Capable of being a District Agent

There was substantial evidence from which Prudential could have concluded that Plaintiff was capable of being a District Agent. On the Daily Activity Questionnaires, Plaintiff admitted that he drove a car or truck every day, helped with shopping and aided in household chores. (R. at PRU0299, January 13, 2003 Daily Activity Questionnaire; id. at PRU0044, June 25, 2001 Daily Activity Questionnaire.) There are also medical opinions supporting Prudential's decision. Dr. Rosenberg physically examined Plaintiff and concluded that although he suffered from knee trouble, Plaintiff was able to work an 8-hour workday but should be restricted to "occasional walking, occasional standing, no crouching, occasional stair climbing, occasional driving (with an automatic transmission), and lifting is limited to no more than 20 lbs[.] on occasion." (R. at PRU0359, Initial Rosenberg Report.) Dr. Foye reviewed Plaintiff's medical file and examined the surveillance tape and concluded, like Dr. Rosenberg, that Plaintiff was capable of working as a District Agent. (R. at PRU0599-600, Foye Report.) Plaintiff objects that these "independent" medical reviews should not be trusted because Prudential paid the doctors' fees.

Without more, Prudential's considering the opinions of doctors whom it selected and paid is not an abuse of discretion.  <u>See</u> <u>Hobson</u>, 574 F.3d at 90 (2d Cir. 2009).

The surveillance videos also suggest that Plaintiff was not disabled.  They depict him walking without assistance, getting in and out of a car without assistance, driving, lifting a baseball equipment bag, and helping coach little league practice.  (<u>See</u> Prudential Exs. H and I.)  Plaintiff pitches and catches a baseball without apparent difficulty and, although he occasionally appears to rest against a fence while his team is batting, he spends the entire two-hour practice on his feet without a knee brace or a cane.  (<u>Id.</u>)  Doctors Rosenberg, Kaplan and Foye agreed that, based on the capability Plaintiff demonstrated on the videos, Plaintiff could function at the District Agent level.  (R. PRU0677, Addendum Rosenberg Report; <u>id.</u> at PRU0344, Kaplan Report; <u>id.</u> at 0599-600, Foye Report.)

For at least three reasons, the Court rejects Plaintiff's argument that Prudential's use of surveillance in its decision-making was improper (Pl. Br. 23-27).  <u>First</u>, Plaintiff's suggestion that Prudential relied solely on the videotapes is incorrect.  (<u>See</u> <u>id.</u> 24.)  As already discussed, other evidence supporting Prudential's decision included

15

Plaintiff's responses to the Daily Activity Questionnaires and Dr. Rosenberg's initial report, in which he prescribed activity restrictions that were not incompatible with the District Agent job. (R. at PRU0358-59, Initial Rosenberg Report.) Second, the cases Plaintiff cites are inapposite. In Hanuski v. Hartford Life Insurance Co., there was no suggestion that the surveillance results were inconsistent with the plaintiff's reported limitations. No. 06-CV-11258, 2008 U.S. Dist. LEXIS 7520, at *12-14 (E.D. Mich. Jan. 31, 2008). Here, by contrast, Plaintiff told Dr. Rosenberg that he did not participate in his children's sporting activities but was caught on camera pitching during a two-hour little league practice. In Whitley v. Hartford Life & Accident Insurance Co., the court characterized the surveillance video as recording irrelevant activities. 262 Fed. Appx. 546, 555-56 (4th Cir. 2008). Here, however, the videos depict Plaintiff walking, driving, and carrying a bag that seemed to weigh at least ten pounds--the types of things he would do as a District Agent. Third, the caselaw is clear that surveillance is an acceptable way to help evaluate a claimant's entitlement to disability benefits. See, e.g., Williams v. Hartford Life & Acc. Ins. Co., 2010 WL 1418093, at *6 (W.D.N.Y. Apr. 6, 2010) (citing Richard v. Fleet Fin. Group Inc. Ltd. Emp.

Benefits Plan, No. 09-CV-2284, 2010 WL 625003, at *2 (2d Cir. Feb. 24, 2010)); Rotondi v. Hartford Life & Ac. Group, 09-CV-6287, 2010 WL 3720830, at *11 n.9 (S.D.N.Y. Sept. 22, 2010); Glockson v. First Unum Life Ins. Co., 2006 WL 1877140, at *5 (N.D.N.Y. July 6, 2006) (noting that there is "nothing improper in a physician comparing a claimant's behavior on surveillance videotape with claimant's performance in a formal setting").

The Court also rejects Plaintiff's accusation that Prudential cherry-picked a handful of evidence from a medical file that otherwise overwhelmingly supports Plaintiff's entitlement. (See Pl. Br. 12.) Plaintiff argues this point in conclusory fashion, but to the extent Plaintiff points to favorable evidence that Prudential allegedly ignored, the Court is not persuaded. Plaintiff points specifically to Dr. Adler, who examined Plaintiff in 2002 and concluded that "pain would be a significant factor in his probable inability to return to work." (R. at PRU853, Adler Report.) But, although he opined that Plaintiff would be more suited for sedentary work, Dr. Adler suggested that Plaintiff abstain from "excessive" walking and stair climbing. Dr. Adler's opinion was not the only evidence Prudential had concerning Plaintiff's condition, but even if it was Prudential would have been justified in

concluding that Dr. Adler's suggested restrictions were not
inconsistent with the physical requirements of the District
Agent job. Additionally, Dr. Adler examined Plaintiff without
the benefit of the surveillance video, which would have given
him a fuller picture of Plaintiff's capabilities. Further, Dr.
Alder issued his findings in 2002, more than 21 months before
Prudential terminated Plaintiff's benefits.

In the Court's view, rather than cherry-pick favorable
evidence, Prudential was justified in concluding that the
surveillance video undermined the credibility of Plaintiff's
evidence. See Cusson v. Liberty Life Assur. Co., 592 F.3d 215,
229-230 (1st Cir. 2010) ("[Plaintiff] argues that [Defendant]
failed to consider her objective evidence of disability.
However, the record reflects that Liberty reached its decision
not because it failed to consider the evidence in [Plaintiff's]
favor, but because it determined that the surveillance results
undermined the credibility of important portions of that
evidence."). In this case, video of Plaintiff participating in
little league practice undermines the idea that Plaintiff's knee
injury would prevent him from meeting the physical demands of
the District Agent job. And perhaps most damagingly, the video
undermined Plaintiff's own credibility by contradicting his

statements to Dr. Rosenberg that he could not participate in his children's organized sports and that he needed a cane to walk.

Further, in rejecting Plaintiff's cherry-picking argument, the Court notes that Prudential is not required to give special weight to Plaintiff's physicians. Hobson, 574, F.3d at 90. In any event, even one of Plaintiff's doctors reached a conclusion similar to the "independent" doctors that Prudential hired. Dr. Varlotta examined Plaintiff during the course of his appeals, and his opinion was generally favorable to Plaintiff. He concluded that Plaintiff could not tolerate an eight-hour workday as an insurance representative, and he tried to downplay the significance of the video of little league practice. (R. at PRU0963, Varlotta Report.) Nevertheless, he partly agreed with Dr. Rosenberg that Plaintiff's limitations "encompass occasional walking, standing, stair climbing and driving and lifting no more 5 [sic] to 10 lbs." (Id.)

The Court is also not convinced that Drs. Kaplan and Foye were so lacking in credibility that Prudential ought to have disregarded the results of their reviews. (See Pl. Br. 17-18.) Plaintiff argues that Dr. Kaplan's review is incredible because he billed Prudential for only 1.5 hours of his time, during which he purportedly reviewed Plaintiff's medical file

and the surveillance videos, which themselves are at least two hours long. (Id.) The Court can imagine legitimate reasons why Dr. Kaplan billed only 1.5 hours; for example, perhaps he discounted some of his time or watched certain segments of the video (which tended to be repetitive) at an accelerated speed. Similarly, the Court disagrees that Dr. Foye's emphasizing certain conclusions by underlining them or using bold text is probative of bias. (See Pl. Br. 18.) Dr. Foye was specifically asked his opinion of the surveillance footage, and he may have underlined his responses as a way to draw Prudential's attention to the parts of his report that were responsive to Prudential's inquiry. (See R. at PRU0599-600, Foye Report.)

## C. Prudential's Decision Was Not Biased

Plaintiff's primary argument appears to be that Prudential's conflict of interest, coupled with a tainted decision-making process, led to a decision that was inherently unfair. (See generally Pl. Br. 7, 9.) The Court disagrees.

As an initial matter, the Court does not give significant weight to the conflict arising out of Prudential's dual role as the payer of benefits and the evaluator of claimants' eligibility. A conflict of interest "should prove less important (perhaps to the vanishing point) where the

20

administrator has taken steps to reduce potential bias and to promote accuracy." McCauley, 551 F.3d at 133 (quoting Metro Life Ins. Co. v. Glenn, 554 U.S. 105, 117, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)). Here, the Court agrees that Prudential has taken measures to reduce the risk of bias caused by its conflict of interest. Plaintiff's claims and appeals were decided by different Prudential employees, and these employees' compensation was not tied in any way to their eligibility decisions. (See Second Schopfer Decl., Def. Ex. K ¶¶ 3, 4.) These types of steps are key in a court's giving a conflict of interest little or no weight in its analysis. See Fortune v. Group Long Term Disability Plan for Emps. of Keyspan Corp., 637 F. Supp. 2d 132, 144 (E.D.N.Y. 2009). Here, the Court thinks Prudential's conflict is of little, if any, significance.

The Court reaches this conclusion notwithstanding Plaintiff's arguments that Prudential has a history of biased decision-making and that Prudential's Compensation Plan (the "Compensation Plan") rewarded managers who denied disability claims. (Pl. Br. 6-7.) As to an alleged history of bias, Plaintiff cites a number of cases in which Prudential's claims determination have been reversed. (See Pl. Br. 6 n.4.) There are many cases in which Prudential's decisions have been upheld,

however (see Def. Br. 5, 6 & n.3), and many more that are never litigated, and the Court is reluctant to infer an improper motive on the strength of the outcome of other cases. As to the Compensation Plan, Plaintiff has not put forth any evidence that contradicts Prudential's witness who testified that the Compensation Plan was not structured to reward employees who denied disability claims. (See Second Schopfer Decl., Def. Ex. K ¶¶ 3, 4.) Although the claims managers involved in Plaintiff's case received "incentive awards" (Declaration of Jason Newfield, Ex. D), there is no evidence suggesting that these awards took into account the employees' benefits-eligibility decisions. The record indicates that the opposite is true.

The Court also rejects Plaintiff's position that Prudential's decision-making process was irretrievably tainted by irregularities. (See Pl. Br. 6-7.) Plaintiff cobbles together several arguments in support of this theory, but they are unavailing either on their own or taken together.

The Court disagrees that Prudential demonstrated bias in its correspondence with its retained physicians. (See Pl. Br. 10-11.) For example, Plaintiff describes Prudential's November 10, 2003 letter to Dr. Rosenberg requesting an addendum

to his report as going to "extreme lengths" to influence Dr. Rosenberg's finding. In the Court's view, this characterization is inaccurate. Rather, Prudential is seeking a clarification for the apparent disparity between the conclusions of Dr. Rosenberg's original report and the images on the surveillance tapes.

Additionally, contrary to Plaintiff's argument, Prudential did not simply terminate Plaintiff's LTD benefits without an intervening change in its understanding of Plaintiff's disability. (Pl. Br. 15.) Here, Plaintiff's responses to the Daily Activity Questionnaires, the surveillance video, and Dr. Rosenberg's report provided Prudential with new information about Plaintiff's disability that justified its decision to terminate his benefits. Cf. McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002) ("[U]nless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." (emphasis added)).

The Court is also not persuaded by Plaintiff's attempt to show that Prudential tailored its description of the District Agent position to obtain favorable results. Plaintiff argues

that Prudential downplayed the physical requirements of the District Agent job to convince doctors that Plaintiff could perform the job notwithstanding his knee problems. (Pl. Br. 20.) As far as the Court can tell, however, Prudential has not described the nature of the District Agent job in a materially inconsistent way. Plaintiff compares a 2002 letter Prudential sent Dr. Adler (R. at PRU1295) with its follow-up letter to Dr. Rosenberg in 2003 (R. at PRU1306), but the descriptions of the position in the two letters are not at odds with each other. Plaintiff also maintains that, notwithstanding the formal job description, the District Agency position is classified as "light duty," which connotes more than occasional walking and standing. (Pl. Br. 20; 21.) This discrepancy does not compel a reversal of Prudential's decision. See Wenzel v. Prudential Ins. Co. of Am., No. 03-CV-5751, 2005 WL 2365221, at *7 (E.D.N.Y. Mar. 28, 2005) (concluding that discrepancy between a "sedentary" job and one that required the plaintiff to deliver packages for four hours per day was a question of fact and finding "nothing arbitrary or capricious about Prudential's" decision to terminate benefits).

## CONCLUSION

For the foregoing reasons, Plaintiff's summary

judgment motion is DENIED, and Prudential's motion is GRANTED.

The Clerk of the Court is directed to mark this case CLOSED.


                              SO ORDERED.

                              /s/ JOANNA SEYBERT_____
                              Joanna Seybert, U.S.D.J.

Dated:     September __26__, 2011
           Central Islip, New York